Filed 5/4/21  P. v. Bennett CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072435 |
| v. | (Super.Ct.No. RIF1405852) |
| DARLA ANNE BENNETT et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Ronald L. Taylor, Judge. (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part; reversed in part with directions.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant Darla Bennett.

Robert Booher, under appointment by the Court of Appeal, for Defendant and Appellant Sonnie Chavira.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant David Harrison.

1

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Allison V. Acosta, Deputy Attorneys General, for Plaintiff and Respondent.

Following a jury trial, Darla Anne Bennett, her son, Sonnie (aka Scott) Chavira, and her boyfriend, David James Harrison, were each convicted of first degree murder for the killing of Bennett's husband, Juan Servin (the victim). All three defendants challenge their convictions, raising various contentions (whether collectively or individually) concerning the admission of evidence, the sufficiency of the evidence, the jury instructions, prosecutorial error, effective assistance of counsel, the denial of a motion for new trial, and sentencing error. We strike Harrison's five one-year prison term enhancements and direct that his abstract of judgment be corrected to reflect the trial court's order that his parole revocation restitution fine, court operations assessment, criminal conviction assessment, and booking fees be suspended until it is determined he has the ability to pay them. In all other respects, we affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

*A.     Background.*

Bennett was married to the victim, and they lived in a house with Chavira and a roommate. The roommate rented a room from Bennett and worked the night shift at Amazon. The victim was an imposing figure, five feet seven inches, weighing 276 pounds, and exceptionally strong. He had long been a heavy drinker, but after the death of his son, his drinking increased to one to two cases of beer and hard alcohol each day.

2

When he was drunk, he argued with everybody, including the neighbors, and at times, he was physically combative. His drinking caused him to lose his job.

The victim would hang out in the garage, drink, and yell at Bennett (who was 5 feet 5 inches tall) and Chavira (who weighed about 180 pounds), calling Bennett names or belittling and embarrassing Chavira in front of other people. When the victim yelled in Chavira's face, Chavira did not argue or yell back. The more the victim drank, the worse his mood toward Chavira became. By early November 2014, Bennett became romantically involved with Harrison, also known as "Black."

*B.    The Crime.*

In late November 2014, Bennett and Chavira visited Bennett's aunt and uncle. When asked what she was going to do when she got home, Bennett replied, "'I'm going home and kill that [son of a bitch].'" She was referring to the victim. Chavira said, "'No, you're not. I am.'"

On December 4, 2014, a California Highway Patrol officer discovered the victim's body along the 60 freeway, east of Gilman Springs Road, wrapped in a yellow blanket with a black plastic bag over his head. There was a clear plastic bag inside the black bag. After the victim was identified, police officers went to his home, arriving sometime between 8:00 and 10:00 p.m.

A search of the garage revealed blood splatter in various locations, including the ceiling, and indications the area had recently been cleaned. Inside a trash can, officers found a photograph of the victim's sons in their military uniforms. The victim had suffered numerous abrasions and lacerations on his head and face, both sharp injuries and

3

splitting of the skin from blunt impact injuries, possibly caused by an ax, heavy knife, machete, weight, or other heavy object. His skull was fractured in two places. An autopsy of the victim's body indicated that he died due to bleeding caused by "sharp- and blunt-force injuries to the head." However, it could not be ascertained whether these injuries were caused by one or more instruments because weapons such as an ax or machete can be used to cause both types of injuries. A tattoo on the victim's chest, depicting his son who was killed in Afghanistan, was used to identify him.

C.     *Defendants' Actions After the Crime.*

1.     *Bennett*

On December 3, 2014, at approximately 11:00 p.m., Bennett called a friend of both Bennett and the victim, but the friend did not answer the telephone call. The friend testified that the victim's game table "just showed[ed] up at [his] house one day." At 12:43 a.m. on December 4, Bennett went to a grocery store and purchased CLR cleaner, using cash. Around 2:00 to 3:00 a.m., Bennett parked her truck at her next-door neighbor's home. At 6:00 a.m., the neighbor saw Bennett sitting in the truck, and he invited Bennett into her home, where Bennett took a shower and stayed for breakfast. Later that morning, Bennett called one of the victim's ex-coworkers at the school district and asked if he was still interested in buying the victim's kegerator. When the ex-coworker went to Bennett's house to pick up the kegerator, Bennett said the victim had left, and she was getting rid of his stuff.

On December 4, 2014, around 6:30 p.m., Bennett rented a room at a hotel. The next day, she was arrested at the hotel. A search of her personal belongings produced

4

receipts from a grocery store and fast food restaurants. While in jail, Bennett sent a letter to her next-door neighbor, asking him to check on Harrison and, "'Tell him I love him until death parts us.'" She sent the neighbor a second letter shortly thereafter in which she asked him to find out about Harrison since he had been arrested.

### 2. *Chavira*

Bennett's aunt testified that Chavira fashions knives or dagger-type things to use on his hiking trips. Phone records for Chavira's cell phone show that from December 3 at 10:39 p.m. to December 4, 2014 at 2:04 p.m. and 5:08 p.m., there was tower activity and sector selection consistent with Chavira being in Long Beach. On or about December 5, Chavira called his uncle to tell him that Bennett had been arrested, and he (Chavira) wanted to come Texas.

In Texas, Chavira expressed a concern that there may be a warrant for his arrest, so they checked online. By January 18, 2015, a warrant showed up. Chavira's uncle drove Chavira to Dallas. During the drive, Chavira told his uncle that the victim was "irate and was throwing beer cans at his mother and things got out of hand." Chavira explained that he "tried to get [the victim] to stop. Things escalated, and he hit him in the head" with a hammer, and the victim died. Chavira never told his uncle that he (Chavira) "snapped" or that some negative emotions toward the victim had been "building up inside" him; but he did say that "things escalated." He stated that Harrison helped get rid of the body, but Harrison "got weak and couldn't go on with it anymore, and they left [the body] on the side of the [highway]." Chavira claimed that all three defendants went back to the house and cleaned up.

5

### 3. Harrison

At 11:19 p.m. on December 3, 2014, Harrison was seen driving a white pickup truck two blocks from Bennett's home. He helped dispose of the victim's body, and he helped clean the garage. Between December 2 and 8, there were 251 contacts between Bennett and Harrison's phones. On December 3, a call made at 7:23 p.m. from Harrison's phone hit a tower along Highway 60 about a half mile west of where the victim's body was recovered. Between 7:41 and 8:23 p.m. a call lasting 42 seconds was made from Harrison to Bennett's phone, and between 9:31 and 10:21 p.m., five calls were made from Harrison to Bennett.

Harrison's red Chevrolet Corvette and a Nissan Sentra rented by his wife were processed for evidence of the crime, and the victim's blood was found inside the vehicles. On December 8, 2014, an investigator interviewed Harrison, who acknowledged having a relationship with Bennett but denied being involved in the murder. Harrison claimed that he was home with his wife on the night of the murder, but he may have stopped by Bennett's around 6:00 p.m. but did not stay.

### D. Bennett's Statements to her Cellmate.

On December 19, 2014, an inmate (B.) was placed in a cell at the Robert Presley Detention Center with Bennett. By December 22 or 23, Bennett told B. that "Riverside County didn't have anything on her, and . . . the sheriffs . . . think that she used a knife or a machete . . . for what she did." A week or two later, Bennett told B. the "whole story." Bennett said the victim was "very verbally abusive to her. He was intoxicated, and he would call her certain names and things like that. And her son, he didn't like it." She

6

said that on the night of the incident, she, her son, and her boyfriend Harrison, were in the garage with the victim. The victim "started calling her names—whore and other names—and . . . her son and [the victim] started arguing a little bit. . . . [¶] She walked out the exit to the garage, and when she returned, her son was hitting [the victim] . . . with a stick, repeatedly just hitting him, and it was like if he was . . . taking the blows. So she said that's when Black stepped in and picked up a weight and hit [the victim] on top of his head. She said he was still alive, and . . . she went and grabbed a plastic bag and put it over his head." Bennett said that "no matter how hard her son was hitting [the victim] with the stick, it seemed like it wouldn't knock him down. . . . So that's when her boyfriend Black[1] . . . stepped in and assisted the son." Because Bennett saw the victim breathing, she obtained a plastic bag and put it over his head.

According to B., Bennett stated that they wrapped the victim in a sheet, put him on an ironing board, and placed him in the car. They "drove around with the body in the car for a while trying to figure out what to do with it." They encountered a wreck on the freeway,[2] and they decided to throw him "on the side of the road" somewhere toward

---

[1] B. told sheriff's investigator Gomez that Bennett said she had been seeing Harrison for seven weeks but, at trial, B. said Bennett indicated she had been seeing him for two to three months. B. testified that "[s]even weeks is about two to three months to [her]," "when it's not that important to [her]," and she is more concerned about the details of "a dead guy [being placed] on the side of the road."

[2] When she first talked to investigator Gomez, B. told him "the body was placed off the 10 freeway on the side of the road." At trial she explained that she "probably assumed" it was the 10 freeway because she was not "very familiar with the casinos and the freeways out there" and thought the 10 freeway was "the only freeway you can [use to] get to Morongo."

Morongo. Afterwards, she dropped her son off in Long Beach at his father's house where they cleaned her car, and Harrison left.[3] Bennett bragged that she "had back surgery, and that was her story, and the cops would never be able to find out that she did this." She explained that "because [the victim] was overweight and she had back surgery, it was impossible for them to think that she lifted him with her injuries to her back."[4]

B. testified that Bennett said she moved most of the victim's stuff out of the garage and cleaned up the blood before her roommate came home. She said she told the roommate the victim had moved out. Bennett said the roommate helped her cleanup, and "'she didn't know she was helping me . . . cover this up.'" Bennett stated she gave some of the victim's stuff to other people. Bennett also talked about her son, revealing that he was "kind of obsessed with hiking trails, and he would hike all over the world." She claimed that she, Chavira, and Harrison previously discussed killing the victim, but "it didn't work out that way."

While incarcerated, B. witnessed Bennett's relationship with Harrison deteriorate when he "wouldn't communicate with her via jail communication." By December 30, 2014, she was done with Harrison and "started getting on a more serious romantic level" with his cellmate. On New Year's Day 2015, Bennett told B. about Harrison's role in the crime.

---

[3] Initially, B. told investigators that Harrison followed Bennett to Long Beach.

[4] Bennett had undergone several neck and back surgeries, as recent as 2014, and she relied on her next-door neighbor to assist with housework and taking her to appointments.

Investigator Gomez was investigating the death of the victim, and Bennett was in possession of his business card. B. saw the business card and on December 26 or 27, 2014, she began calling him, and she wrote a letter to him. On January 9, 2015, investigator Gomez interviewed B. On January 22, she entered into an agreement with the district attorney's office regarding her outstanding charges for her testimony regarding Bennett's statements made concerning the victim's death. Pursuant to her agreement, she pled guilty to two counts of impersonating a police officer (Pen. Code, § 538d), felony extortion (Pen. Code, § 518), attempted extortion (Pen. Code, § 524), felony identity theft (Pen. Code, § 530.5), obtaining money by false pretenses (Pen. Code, § 532), attempting to obtain money by false pretenses (Pen. Code, §§ 664, 532), welfare fraud (Welf. & Inst. Code, § 10980), and perjury (Pen. Code, § 118).[5] Her prior convictions included misdemeanor identity theft, theft by forged access card, use of account data, and federal bank fraud. B.'s criminal history, acts of dishonesty, and motivations for testifying were the subject of extensive testimony and thorough cross-examination by defense counsel.

E.    *Charges*, *Verdict*, *and Sentences.*

An information filed on March 9, 2016, charged defendants with murder. (§ 187, subd. (a).) The information also alleged that Harrison unlawfully possessed a firearm (§ 29800, subd. (a)(1)), was convicted of two serious priors (§ 667, subd. (a)), served five prior prison terms (former § 667.5, subd. (b); Stats. 2014, ch. 442, § 10, eff. Sept. 18,

---

[5] All further statutory references are to the Penal Code unless otherwise indicated.

2014), and had two prior strike convictions (§§ 667, subds. (c), (e)(2)(A), 1170.12, subd. (c)(2)(a)). On April 12, 2017, Harrison pled guilty to unlawfully possessing a firearm. (§ 29800, subd. (a)(1).)

On May 3, 2017, the jury convicted defendants of first degree murder. The trial court sentenced Bennett and Chavira to 25 years to life in state prison and, after Harrison admitted his prior conviction allegations, the court sentenced him to an aggregate term of 35 years to life in state prison.

## II. DISCUSSION

### A. The Trial Court Committed No Evidentiary Errors.

Bennett and Chavira contend the trial court erred in admitting a picture of the victim's deceased son into evidence. Harrison contends the trial court erred in admitting Bennett's statements to B. We find no errors. Even if we did, a reversal of the judgment is not warranted. (*People v. Richardson* (2008) 43 Cal.4th 959, 1001 [erroneous evidentiary ruling does not require reversal absent a miscarriage of justice].) Given the compelling nature of the evidence against defendants, it is not reasonably probable they would have obtained a more favorable verdict absent any error, whether viewed cumulatively or singularly.

In California, evidence possessing any tendency in reason to prove or disprove any disputed material fact is relevant and admissible. (Evid. Code, §§ 210, 351; *People v. Garceau* (1993) 6 Cal.4th 140, 177.) "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time.

10

[Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

### 1. *A picture of the victim's sons.*

The trial court admitted, over defendants' objections, a photograph of the victim's sons dressed in their military uniforms as United States Marines.[6] In seeking to admit the evidence, the prosecutor argued that the jury would learn that one of the victim's sons was killed in Afghanistan because the victim had a tattoo to that effect, and the tattoo was used to identify the victim. The photograph was one of the first things the police saw when they looked in a trash can at the victim's home. Defense counsel acknowledged the photo's relevance in regards to the cleanup but argued that the prosecutor could present evidence of the cleanup in other ways. The trial court found the evidence was relevant because it was found in a trash can, it had been in the garage, and it had a droplet of the victim's blood on it. As to the evidence being unduly prejudicial, the prosecutor recognized that everything he presents is going to be prejudicial, but he explained there is no reason the victim would have thrown away the photograph of his sons with all of the "knickknacks" found in the trash can if he had moved out of his home. The prosecutor

---

[6] The picture of the victim's sons was one of three photographs the prosecutor sought to admit: (1) exhibit 59 shows items in a trash can, including the photograph in question; (2) exhibit 62 is the photograph itself; and (3) exhibit 63 is a close-up of the exhibit 62 photograph.

11

noted it was his burden to show that the victim was not the person who placed those items in the trash can. The court found that the evidence was offered on "a central issue in the case," it would not confuse the jury, and it would not require an undue consumption of time. After weighing these various factors, the court concluded its prejudicial effect is substantially outweighed by its probative value.

During the trial, the photograph of the victim's sons in their military uniforms was introduced into evidence. The prosecutor inquired about the photograph as follows:

"Q. The Marine to the left, do you know who that is?

"A. That's [the victim's] youngest son.

"Q. Do you see him in court today?

"A. I do.

"Q. Where is he?

"A. He's sitting to the very rear of the courtroom in a gray shirt with a white undershirt."

On appeal, Bennett and Chavira argue the photograph was (1) irrelevant because a wealth of other evidence established that the victim had not simply left and taken his belongings; (2) cumulative to other evidence concerning blood splatter on various objects in various parts of the garage; and (3) highly prejudicial because it presented defendants as cold, heartless, and un-American monsters, willing to kill a man who had lost his son in combat, and then throw away a photograph of that son. Chavira further argues he presented significant evidence that showed he may have acted out of heat of passion or in

12

defense of his mother, and this inflammatory evidence tipped the scales for the jury. As we explain, the trial court properly admitted the photograph.

The photograph of the victim's sons was relevant because it clarified Bennett's testimony. She told people that she had fought with the victim and he "got some [friends] to move him out." While the victim may have thrown away several "knickknacks," it was not logical for him to throw away a photograph of his sons. Thus, the photograph rebutted Bennett's claims that the victim and his friends moved him out. Also, since the photograph was introduced with another exhibit showing where it was found, namely, in a trash can, it was not calculated or used to arouse the jury's sympathy. (*People v. Thompson* (1988) 45 Cal.3d 86, 115 [photograph of the victim while alive "was not a photograph particularly calculated to elicit sympathy"].)

Bennett claims, to the extent it is relevant, the photograph was cumulative of "other items" evidence. Her reliance on *People v. Vindiola* (1979) 96 Cal.App.3d 370, 383-384, overruled on other grounds in *People v. Carter* (2003) 30 Cal.4th 1166, 1197, is misplaced. In that case, the trial court admitted into evidence prior booking photographs depicting defendant with a mustache to impeach his sister's testimony that she had never seen him with a mustache. (*People v. Vindiola*, at pp. 383-384.) The Court of Appeal held that the admission of defendant's prior booking photographs was error because defendant's photograph from the booking on his current offense, admitted into evidence, also showed him with a mustache, and the prior booking photographs "carry the inevitable implication that [defendant] suffered previous arrests and perhaps convictions." (*Id*. at p. 384.) Such is not the case before this court. While there was

13

"other evidence" to establish the victim "had not simply left and taken his belongings," it was the prosecution's burden to establish defendants' guilt beyond a reasonable doubt. (§ 1096.) Evidence showing defendants were responsible for cleaning the garage was vital to showing they murdered the victim. The fact there was a drop or two of blood on the photograph showed that it was placed in the trash can after the murder, during the cleanup process. And, "[c]ontrary to defendant's claim, evidence does not become irrelevant simply because other evidence may establish the same point." (*People v. Smithey* (1999) 20 Cal.4th 936, 973-974.)

Nonetheless, defendants assert the prosecutor's focus on this photograph during opening statement and while questioning sheriff's investigator Freeman, directing him to identify for the jury defendant's remaining living son, implicitly conveyed to them that defendants were "cold, heartless, and un-American monsters." While evidence of defendants' disposal of the photograph is prejudicial, the prejudice that Evidence Code section 352 seeks to avoid is not that which """"naturally flows from relevant, highly probative evidence.""" (*People v. Harris* (1998) 60 Cal.App.4th 727, 737.) "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) As the People point out, the jury would have found the murder itself to be more "cold and heartless" than the disposal of the photograph.

## 2. *Bennett's Second Statement to B.*

Harrison contends the trial court erred in admitting Bennett's second statement to B. in which Bennett implicated Harrison. We disagree.

Prior to trial, the prosecutor sought to admit Bennett's statements to B. as statements by a codefendant against her penal interest. Chavira objected on the ground the statement violated the confrontation clause, and Harrison moved to sever his trial on the ground a joint trial would violate his rights of confrontation, cross-examination, and due process. Concluding the confrontation clause did not apply (*People v. Arceo* (2011) 195 Cal.App.4th 556), the trial court framed the issue as whether Bennett's statement fell within a hearsay exception and was supported by indicia of trustworthiness.

Chavira argued that Bennett's statements are not trustworthy because she initially claimed to have killed the victim with a knife but later provided a different account. The prosecutor responded that this inconsistency went to the weight of the evidence rather than its admissibility. The court found the statements were admissible under Evidence Code section 1230 as a statement against interest. Harrison urged the trial court to consider the motivation of both Bennett and B. He claimed that Bennett was "boasting," while B. "was asking for less time" in custody. Acknowledging Bennett's incriminating claim of putting a bag over the victim's head to make sure he was dead, Harrison maintained the issue is whether or not we can trust her statements. The court found the statements to be trustworthy, and any concerns regarding motivation went to weight and not to admissibility.

15

A hearsay statement is admissible when it is made against the declarant's penal interest. (Evid. Code, § 1230.) "To demonstrate that an out-of-court declaration is admissible as a declaration against interest, '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' [Citation.] 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.] [¶] We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion." (*People v. Grimes* (2016) 1 Cal.5th 698, 711.)

Harrison asserts the portions of Bennett's second statement that implicated him in the homicide were improperly admitted as declarations against her penal interest because they shifted blame away from herself, and they do not meet the test of trustworthiness. We disagree.

In determining trustworthiness, "[t]he trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334.) Here, Bennett participated in the murder and personally witnessed Chavira and Harrison hit the victim with a stick and then with a weight to the

16

top of his head.  Her statements were made to her cellmate not law enforcement, and Bennett had no reason to assume that the cellmate would share this information with the police.  If Bennett's motive was to inculpate Chavira and Harrison for the victim's murder, she presumably would not have confessed to putting a bag over the victim's head while he was still breathing.  Her statements specifically disserved her interest and were made under circumstances that suggest their reliability.  (See *People v. Gordon* (1990) 50 Cal.3d 1223, 1252-1253 [accessory's statement to law enforcement that he provided shelter and medical care after the defendant had been wounded in a robbery was trustworthy because of the significant criminal liability that the statement risked]; *Greenberger*, at p. 337 [codefendant statements describing his role as only the driver and smaller than his codefendant's in a kidnapping and murder were sufficiently disserving of his penal interest that "a reasonable person in his position would not have made them unless he believed them to be true"]; *People v. Wilson* (1993) 17 Cal.App.4th 271, 275-277 [wife's statements that, following the attempted homicides and pursuant to her husband's instruction, she retrieved the gun he had used and took it to her mother's house, specifically disserved her interest and therefore was reliable and admissible].)

Nonetheless, Harrison calls the second version of Bennett's statements into question because she provided it two days after their relationship had ended, and it implicated him for the first time.  He asserts that it seems blatantly obvious that she was retaliating against him for the demise of their relationship, and the prosecution did not offer any other explanation for the complete change in her account of how the homicide occurred.  Once again, if Bennett's motivation was to retaliate against Harrison and shift

17

the blame, she would not have implicated herself and her own son. Harrison's concerns about Bennett's motivation did not warrant exclusion of her statements altogether. Rather, they were relevant to the weight the jury gave them.

Harrison's challenge to B.'s credibility is legally irrelevant and a red herring. Evidence Code section 1230 addresses the hearsay statements of an unavailable declarant, which B. was not. She testified at trial, and defense counsel thoroughly vetted her credibility on cross-examination by challenging her honesty and motivation to lie. The jury heard evidence of her numerous felony convictions, along with the fact that her testimony was pursuant to a plea agreement. The jury could use this evidence when evaluating her credibility.

### B. Sufficiency of Evidence.

Harrison contends the evidence was insufficient to establish that he committed or aided and abetted Bennett and/or Chavira in the homicide because the case against him was based on the uncorroborated testimony of an in-custody informant, convicted felon, and experienced liar, who related uncorroborated statements of an accomplice implicating him in the victim's death. He further contends that his presence at the scene of the crime fails to show that he acted with express or implied malice, shared the murderous intent of Bennett and/or Chavira, or aided and abetted Bennett and/or Chavira in killing the victim. Harrison's claims are meritless.

"In evaluating a claim that a conviction lacks sufficient evidence, '"we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a

18

reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.'"  [Citation.]  We focus "'on the *whole* record of evidence presented to the trier of fact, rather than on "'isolated bits of evidence.'"'"  [Citation.]  "''"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment."''"  [Citations.]  Instead, reversal is required only if "'it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'"'"  (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1019-1020.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)  "All murder that is perpetrated by . . . willful, deliberate and premeditated killing . . . is murder of the first degree."  (§ 189, subd. (a).)  A criminal defendant may be convicted of a crime either as a perpetrator or as an aider and abettor. (§ 31.)  "Aiding and abetting is not a separate offense but a form of derivative liability for the underlying crime."  (*People v. Gentile* (2020) 10 Cal.5th 830, 843.)  "[A]n accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.'"  (*Ibid*.)  "Factors to be considered by the trier of fact in determining 'whether one is an aider and abettor include presence at the scene of the crime, failure to take steps to attempt to prevent the

19

commission of the crime, companionship, flight, and conduct before and after the crime.'" (*People v. Garcia* (2008) 168 Cal.App.4th 261, 273.)

According to B.'s testimony, Bennett, Chavira and Harrison murdered the victim. Specifically, Harrison was identified as the one who picked up a weight and used it to hit the victim on top of his head. Harrison then helped dispose of the body. However, Harrison contends Bennett's statements to B. were not sufficiently corroborated within the meaning of sections 1111 and 1111.5. Contrary to Harrison's contention, there was independent corroborating evidence for B.'s testimony and Bennett's statements.

Section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Section 1111.5, in relevant part, provides: "(a) . . . The testimony of an in-custody informant shall be corroborated by other evidence that connects the defendant with the commission of the offense, . . . to which the in-custody informant testifies. Corroboration is not sufficient if it merely shows the commission of the offense . . . . [¶] (b) As used in this section, 'in-custody informant' means a person, other than a codefendant, . . . accomplice, or coconspirator, whose testimony is based on statements allegedly made by the defendant while both the defendant and the informant were held within a . . . correctional institution. Nothing in this section limits or changes the requirements for corroboration of accomplice testimony pursuant to Section 1111." "'"[T]he corroborating evidence may be circumstantial or slight and entitled to little consideration

20

when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime. The corroborating evidence need not by itself establish every element of the crime, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime.""'" (*People v. Gomez* (2018) 6 Cal.5th 243, 307-308.)

Here, despite B.'s credibility issues—which were extensively vetted by the prosecution and defense counsel—her testimony included details that had not been publicly released and were consistent with the physical evidence. According to the autopsy, the victim died from numerous blunt impact injuries, including a fractured skull and 18 wounds to the top of his head. The victim was described as a very large, strong man. Given his size, his murder would have required the actions of more than one person. Bennett was five feet five inches tall and had several neck and back surgeries (most recently in 2014), which limited her mobility and required the need for a caregiver. Chavira weighed approximately 180 pounds and was described as a nonviolent, nonconfrontational person. Harrison acknowledges that he was physically fit and muscular. Although Chavira's confession to his uncle implicated only himself (Chavira), he confirmed that Harrison was present, that the victim was beaten and wrapped in a sheet, and that all three defendants cleaned up the garage. This evidence tied Harrison to the murder in such a way as to satisfy a reasonable trier of fact that B. and Bennett (in her statements to B.) had told the truth.

Moreover, given Harrison's behavior before, during, and after the murder, a jury could reasonably infer that he knew of the plan to kill the victim. Harrison had been

21

involved with Bennett for less than two months prior to the murder. Although he downplays their relationship as "casual," a jury could reasonably conclude that no one would help a "casual" partner cover-up a murder unless he was an active participant in the murder itself. Likewise, his relationship with Bennett provided a motive for his participation. Even if Harrison did not know of Bennett and Chavira's plan before the attack, a jury could reasonably conclude Harrison realized it during the assault, and he actively aided and abetted Chavira by using the weight to hit the victim on his head, or by preventing the victim from effectively defending himself or escaping. In sum, substantial evidence supports Harrison's conviction for murder.

### C. A Unanimity Instruction Was Not Required.

Chavira asserts the trial court erred in failing to provide a unanimity instruction because the jurors may not have unanimously agreed as to the factual basis of how Chavira committed the offense, namely, whether he beat the victim to death with a hammer or a stick. We find no error.

"The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed [him] guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court

22

must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*People v. Russo* (2001) 25 Cal.4th 1124, 1134-1135.)

Here, the evidence showed only one act that could form the basis for the murder conviction: the act of beating the victim to death with a blunt object on December 3, 2014.[7] (*People v. Seaton* (2001) 26 Cal.4th 598, 671.) There was no evidence that Chavira beat or assaulted the victim at any other time. Thus, there was no evidence to suggest more than one discrete crime. (*People v. Russo*, *supra*, 25 Cal.4th at p. 1132.) The object used by Chavira, a hammer, or a stick, was a fact concerning how he committed the murder, and jury unanimity is not required "as to the exact way the defendant is guilty of a single discrete crime." (*Id.* at p. 1135.) Therefore, the trial court was not obligated to give the unanimity instruction.

D.       *Chavira and Harrison's Claims of Ineffective Assistance of Counsel Fail Because There Was No Prosecutorial Error.*

Both Chavira and Harrison contend they were denied the effective assistance of counsel. Chavira argues his counsel was deficient for failing to assert prosecutorial error during closing argument. Specifically, he faults his attorney for failing to object to the

---

[7] We reject Chavira's assertion that the jury was faced with two causes of death: blood loss from the hit to the victim's head or asphyxiation from the bag over his head. The autopsy confirmed the cause of death to be blood loss.

23

prosecutor's (1) argument analogizing premeditation and deliberation to deciding whether to stop at a yellow traffic light, (2) argument that premeditation may be inferred from Chavira's actions while the victim was bleeding to death on the ground, and (3) misstatement regarding the burden of proof. Harrison argues his counsel failed to act as a conscientious advocate during the hearing on the motion for new trial. We address each issue in turn.

### 1. General legal principles.

"'A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects "'the trial with unfairness as to make the resulting conviction a denial of due process.' [Citation.]" [Citation.] The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor. [Citation.] Conduct that does not render a trial fundamentally unfair is error under state law only when it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'"'" (*People v. Young* (2019) 7 Cal.5th 905, 932.) When a claim of prosecutorial error[8] "'focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Smithey*, *supra*, 20 Cal.4th at p. 960.)

---

[8] "'[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

"[T]o preserve a claim of prosecutorial misconduct for appeal, ""'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.'" [Citation.] The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.'" (*People v. Hoyt* (2020) 8 Cal.5th 892, 942-943.) The requirement is meant to """"encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had,'"'" and it is """"unfair to the trial judge and to the adverse party to take advantage of an error on appeal when it could easily have been corrected at the trial.'"'" (*People v. Forrest* (2017) 7 Cal.App.5th 1074, 1081, italics omitted.)

"A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel." (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both that (1) "counsel's performance . . . fell below an objective standard of reasonableness under prevailing professional norms" and (2) there was "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; see *Strickland v. Washington* (1984) 466 U.S. 668, 687.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, at p. 694.)

Generally, "in the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal." (*People v. Frierson* (1991) 53 Cal.3d 730, 749.) In other words, because "[t]he appellate record . . . rarely shows that the failure to object was the result of counsel's incompetence; . . . such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored." (*People v. Lopez*, *supra*, 42 Cal.4th at p. 966.) Thus, reversal on direct appeal for ineffective assistance of counsel is warranted only if "'(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' [Citation.] '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.'" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.)

      2.     *Chavira's claims.*

      a.     Yellow traffic light example.

Chavira complains the prosecutor's yellow traffic light example during closing argument minimized the highly culpable mental process of premeditating the murder of a human being by equating the deliberation and premeditation required for first degree murder with the habitual practice of safely operating a vehicle on the roads. We disagree.

26

During closing, the prosecutor argued that premeditation and deliberation may occur quickly, analogizing premeditation to the split-second decision of whether to stop when a traffic light turns yellow. He described how a person in that situation assesses the surrounding circumstances—traffic, speed, type of vehicle, whether there is a car close behind, and whether there is a traffic camera or police officer present—extremely quickly.[9] In contrast, he argued, "[t]he injuries caused here didn't take just seconds to do" and emphasized the number of injuries the victim suffered.[10]

On appeal, Chavira cites *People v. Nguyen* (1995) 40 Cal.App.4th 28 and argues the prosecutor's argument is similar to those that have been held to impermissibly make

---

[9] "A decision to kill made rashly, impulsively, and without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the reflection, not the length. [¶] The example I like to give when we talk about deliberation is something we can all relate to. I like to use the traffic light example. [¶] You're approaching a traffic light. You're driving a car, and there's traffic. There[ are] cars in front of you and behind you. The light turns from green to yellow. [¶] You deliberate. You carefully weigh and consider the options. It happens very quickly, but you have to make a decision, and it's an important decision. It has dire consequences whether to proceed safely through an intersection or stop. [¶] You think about all the things that go through your mind that you have to think about in that split-second–or those few seconds at the most. You think how fast you're going. You think about the traffic conditions. You take into consideration the vehicle you're driving. Perhaps you are driving one of those older cars that takes a little bit more to stop. You think is there somebody right behind you right on your tail. If you brake, that person will hit you. You think sometimes is this one of those traffic light camera intersections? Am I going to get caught if I go through this intersection? Is there a police officer sitting on the corner? That might affect your decision to stop. You deliberate, and you make a decision, and that's done in seconds."

[10] "The injuries caused here didn't take just seconds to do. That section alone is nine separate injuries. This is just the top and back of his head. This is not even injuries to his face. The second cluster is an additional nine. At what point when you're hacking away at somebody's head does it go from second degree or manslaughter to first degree murder?"

27

light of the reasonable doubt standard of proof. Not so. In *Nguyen*, the prosecutor argued the reasonable doubt standard "'is the standard in every single criminal case. . . . [¶] It's a very reachable standard that you use every day in your lives when you make important decisions, decisions about whether you want to get married, decisions that take your life at stake when you change lanes as you're driving. If you have reasonable doubt that you're going to get in a car accident, you don't change lanes.'" (*Id*. at p. 35.) In that case, the argument concerned only the prosecution's burden of proof, not the definitions of premeditation or deliberation. Also, the error in *Nguyen* was harmless, not prejudicial. (*Id.* at pp. 36-37.)

Here, the prosecutor's use of a yellow traffic light hypothetical to illustrate the concept of deliberation and premeditation was not unique. (*People v. Avila* (2009) 46 Cal.4th 680, 715 [rejecting prosecutorial error claim relating to yellow light analogy]; *People v. Son* (2020) 56 Cal.App.5th 689, 699-700 [analogizing premeditation to a yellow light need not be accompanied by the caveat that going through a yellow light is less serious than murder]; *People v. Wang* (2020) 46 Cal.App.5th 1055, 1085-1087 ["Consistent with the law, the prosecutor used the traffic light illustration to explain the concept of premeditation and deliberation as a weighing of options that can happen very quickly."]; *People v. Henderson* (2020) 46 Cal.App.5th 533, 548-551 [finding prosecutorial error claim forfeited and rejecting claim that trial counsel's failure to object to yellow light analogy was ineffective or prejudicial].) These cases considered the same issue and rejected it. We agree with them. Although the prosecutor used the term "split-second," when viewed in context, he clearly argued that killing with premeditation and

28

deliberation is similar to running a yellow traffic light in that the decision or choice may be made very rapidly but after reflecting and weighing the consequences. His argument did not have the effect of undermining the trial court's instruction to the jury that "defendant acted deliberately if he or she carefully weighed the considerations for and against his or her choice and, knowing the consequences, decided to kill." We reject Chavira's *unsupported* assertion the decision "whether or not to stop at a yellow light is reflexive and habitual, informed by many factors, including one's experiences in driving, but occurs almost entirely unconsciously, . . . the result of 'unconsidered or rash impulse.'"

We also reject Chavira's claim that the yellow traffic light analogy "trivialized [the prosecutor's] burden to prove premeditation and deliberation by implying he could meet the burden if [defendants] simply decided to kill, even in less than half a second." (*People v. Avila*, *supra*, 46 Cal.4th at p. 715 [prosecutor did not equate decision whether to stop at yellow light with cold, calculated judgment of murder, but instead used assessment of circumstances as an example of a judgment that is cold and calculated but quick].) Although prosecutors must exercise caution to ensure their word choice does not suggest action that is instantaneous and without reflection, the record in this case does not support the interpretation that the prosecutor misled the jury by trivializing or dismissing the deliberative process required to support a finding of willful, deliberate, and premeditated murder. In short, there was no prosecutorial error.

b.      Reference to defendants' actions while the victim was bleeding.

Next, Chavira faults his trial counsel for failing to object to the prosecutor attacking his defense arguments that he acted in a heat of passion or in the defense of his mother. Chavira contends that because there is no evidence that it took five minutes for the victim to die, the prosecutor erred in using this "evidence" to craft a legal argument that completely eliminated the possibility the jury would find either of his defenses (imperfect defense of other or heat of passion) applicable. We disagree.

According to the medical examiner, the victim's injuries were superficial and potentially survivable. He opined that the victim did not immediately die from his injuries, and it would have taken "some number of minutes . . . to bleed to death and for the heart to stop beating." Given the victim's blood-alcohol concentration of 0.30, he was probably unconscious.

During closing, the prosecutor emphasized that the victim was alive after receiving his injuries because "[i]t took at least five minutes to die." He noted that the defendants moved the victim but did not obtain medical aid for him. Pointing to the plastic bag over the victim's head, the prosecutor argued, "that's deliberation and premeditation. This isn't heat of passion. It isn't self-defense. [The victim] is not a danger to anybody when he's lying there bleeding to death when that bag is placed over his head. That requires planning. That requires someone who has an intent to kill." When discussing the element of intent to kill, the prosecutor argued that defendants did not merely try to incapacitate or hurt the victim. Rather, "[t]his is an assault with a deadly weapon. This is a murder. There's an intent to kill. Because remember, even after all of the blows to [the

30

victim] are done, they moved him. They didn't call the police." He added that, although there is no duty to provide aid to someone who is dying, "the second I wrap that person in a blanket, put a plastic bag over [his] head—even if I didn't cause the injuries that put that person on the ground, once I do that, I'm guilty."

The prosecutor argued that, because the medical examiner testified the victim did not immediately die, when defendants moved his body and started manipulating things, then they became responsible for his death. To emphasize the point, he stated: "If I stood here silent for 30 seconds, it's going to be uncomfortable. It's a long time, at least five minutes. It could have been upwards of 15 while he bled to death while receiving no aid. The coroner said had he received medical attention, he could have survived those injuries. They looked really bad. But in and of themselves, those weren't enough to kill him, but he's bleeding out. And he bled out before he had a chance to suffocate."

When discussing heat of passion, the prosecutor quoted the applicable instruction and argued that "'a person of average disposition'" would not have responded to the victim's insults, yelling, or throwing beer cans by hitting him "over 18 times alone just on the top of the head." He added, "[i]f enough time passes between the provocation and the killing for a person of average disposition to cool off and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter. [¶] That cooling-off period, . . . how long does it take[, after hitting someone over 18 times,] to go get a plastic bag and put it over the person's face, wrap him in a sheet, and put him in the truck? . . . Assuming it took five minutes, it's a cooling-off period of time." Regarding imperfect self-defense, the prosecutor argued defendants could not have

31

actually believed they were in imminent danger of being killed after the victim "passed out and [was] bleeding to death."

In response, Chavira's counsel argued Chavira is guilty of nothing more than voluntary manslaughter because he "believed that the immediate use of deadly force was necessary to defend" his mother, Bennett. Alternatively, defense counsel argued Chavira killed the victim in a heat of passion because of the victim's abusive conduct toward Bennett in general.

In rebuttal, the prosecutor returned to the heat of passion and imperfect self-defense instructions and argued imperfect self-defense means "that one of those beliefs is unreasonable. That still—you still must find that [Chavira] actually believed those things to be true and they were true throughout it. From the moment he started the assault to the moment the assault ended—not just ended because the victim is still alive. You can't drop somebody like that and just walk away and say, 'Well, you know, okay.' Because we know it took at least five minutes for him to die, if not more, when he bled." After pointing out that Bennett got a plastic bag and put it over the victim's head to "make sure" he was dead, the prosecutor added, "ultimately, for heat of passion, it's a person of average disposition. That's the distinction between heat of passion and imperfect self-defense, because the imperfect self-defense you're looking to say, well, he actually believed that, but was it unreasonable? Once again you have to believe that he actually believed it throughout the event."

"While counsel is accorded 'great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation],'

32

counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence." (*People v. Valdez* (2004) 32 Cal.4th 73, 133-134.)  Chavira insists the prosecutor mischaracterized the evidence during closing argument by stating to the jury that it took five minutes for the victim to die.  Not so.

The medical examiner testified that it would have taken "some number of minutes" for the victim to bleed to death.[11]  Also, B. testified that Bennett said she put a plastic bag over the victim's head because he was still breathing after Harrison and Chavira had repeatedly beaten him.  Although there was no specific number of minutes assigned to the period of time it took for the victim to die, the prosecutor's statement that it took five minutes is a permissible conclusion he was allowed to infer from the evidence.

Using this fact, the prosecutor pointed out the conduct of the defendants after they stopped hitting the victim, and argued the evidence does not show that Chavira acted in a heat of passion or based on an unreasonable belief in the need to defend Bennett.  After the beating, while the victim was alive, albeit bleeding to death, Chavira had the opportunity to cool off and assess the situation.  Since the victim no longer posed an

---

[11]  "[PROSECUTOR]:  And if you were to assume hypothetically that these injuries to the head were inflicted over a time frame of, say, a minute—no more than a minute . . . after the last injury was inflicted, would you opine that the victim was still alive for several minutes after receiving the last strike?  [¶] . . . [¶]

"THE WITNESS:  Again, given the nature of these injuries, given the mechanism of the injuries being exsanguination or bleeding out, I don't believe he would be immediately dead at the end of that time frame that you suggested.  It would have taken probably some number of minutes additional—to bleed to death and for the heart to stop beating."

immediate threat, Chavira had the choice of saving his life or making sure he died. The prosecutor urged the jury to use that choice as circumstantial evidence of premeditation and deliberation of the victim's murder. (*People v. Perez* (1992) 2 Cal.4th 1117, 1128 [Where a defendant's conduct after a killing is inconsistent with a "rash, impulsive killing," the jury "could reasonably consider [this conduct] in relation to the manner of killing."].)

Nonetheless, Chavira asserts the prosecutor crafted a legal argument that misstated the law by arguing that in order to claim either imperfect defense of other or heat of passion Chavira was required to do something to prevent the victim from bleeding to death. We disagree. The prosecutor did not argue the failure to render aid after the assault constituted first degree murder if the victim dies. Rather, he argued defendants' actions after the victim fell were evidence of premeditation. In *People v. Perez*, *supra*, 2 Cal.4th at p. 1128, the California Supreme Court considered whether evidence of a defendant's postkilling conduct was relevant to the issue of premeditation. In *Perez*, the defendant killed the victim with a steak knife. "Defendant's obtaining . . . the steak knife from the kitchen is indicative of planning activity. A plausible motive is evident from the fact that the victim was acquainted with defendant. After defendant initially surprised and attacked [the victim], he then decided it was necessary to silence her to prevent her from identifying him. Finally, the manner of the killing is indicative of premeditation. Defendant went searching for another knife after the first knife broke. Even if the initial knifing was spontaneous, defendant had time to reflect upon his actions when the knife

broke. That he went searching for another knife is indicative of a reasoned decision to kill." (*Id*. at p. 1129.)

Here, while the victim was on the ground and breathing, he posed no threat to defendants. Thus, defendants had adequate time to cool off from any heat of passion and/or realize the victim was no longer an imminent threat. Nevertheless, they obtained a plastic bag and placed it over his head. Using this evidence, the prosecutor reasonably urged the jury to consider defendants' postkilling conduct as evidence of their plan and intent to kill. There was no prosecutorial error.

c.      Burden of proof.

Chavira contends his trial counsel was ineffective by failing to object to the prosecutor's closing argument when he conveyed to the jury that they were required to find defendant guilty because there was no other reasonable interpretation of the evidence. Chavira argues the prosecutor misstated the burden of proof. We disagree.

After all defense counsel gave their closing arguments, the prosecutor discussed his burden of proof: "Reasonable doubt is the standard. The judge is going to instruct on reasonable doubt. I'm not going to stand here to go over what that standard is. It's the absolutely highest standard. It's the standard in every criminal case, whether it's a homicide or driving under the influence. Remember it's what it sounds like. If you have a doubt as to the defendant's guilt, it must be reasonable. It must make sense. There's nothing in life that isn't open up to some possible or imaginary doubt. It must be reasonable. It must be something that you say, 'You know what? I thought about it.'" He immediately followed with a discussion about CALCRIM No. 224: "Similarly with

35

instruction 224, we talked about that. You've had an opportunity to see that, circumstantial evidence and the sufficiency of the evidence. It says if you draw two reasonable interpretations of the evidence—two or more conclusions from the circumstantial evidence and one of those reasonable conclusions points to innocence and the other to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

Turning to the facts of the case, the prosecutor asked, "What is unreasonable in this case? . . . I want to take these defendants one at a time and go through a couple of things." After referencing the inconsistencies in B.'s testimony, and defense counsel's suggestion that she changed her account to "fit[] the evidence," the prosecutor argued that it was not "reasonable" because B. did not know anything about the investigator's report. The prosecutor also explained why other evidentiary arguments were not reasonable: (1) Harrison was at home during the murder and only went to Bennett's home to assist in getting rid of the victim's body; (2) B.'s statement that the victim was hit on the top of the head, but the forensic evidence showed the injuries were to the back of the head; and (3) B.'s statement regarding the time when the plastic bag was placed on the victim's head. Focusing on B., the prosecutor asked: "[I]s she a professional liar? [¶] . . . [¶] It's up to you, the trier of fact, to go through [her] statement . . . talk about that, how is it she got that information, and whether or not it's reasonable that [she] was just taking innocuous little things and crafting some sort of story. . . . [Things like Chavira] liked to hike, [and Bennett's roommate] worked at Amazon." The prosecutor concluded with the

36

following: "It's up to you to decide what is the truth in this case. . . . [¶] . . . We all agree when it comes to . . . [B.] . . . or any witness in this case, you don't just look at their priors and say, 'You know what? We're going to reject it.' It's up to you to go through that. That's the hard part about being a juror, is to go through those statements and ask yourself how could it possibly be true otherwise. [¶] There's no other reasonable interpretation of the evidence, ladies and gentlemen, other than the defendants are guilty of first degree murder."

Contrary to Chavira's claim, the prosecutor neither mischaracterized the burden of proof nor "implied that acquittal required the defendant to present a reasonable interpretation of the evidence." Rather, he emphasized the correct standard of beyond a reasonable doubt, and his argument asked jurors to view the evidence in a reasonable manner. "Jurors may use common sense and good judgment in evaluating the weight of the evidence presented to them. [Citation.] Jurors may evaluate the reasonableness of witness testimony, as the jury was instructed in this case with CALCRIM Nos. 226 and 333. The prosecutor may argue 'reasonably possible interpretations to be drawn from the evidence.' [Citation.] 'It is permissible to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory.' [Citation.] The prosecutor may 'urge the jury to "'accept the reasonable and reject the unreasonable'"' in evaluating the evidence before it.'"[12] (*People v. Meneses* (2019) 41 Cal.App.5th 63, 71.)

---

[12] Defendants' jury received CALCRIM Nos. 226 and 333.

The prosecutor's statements do not resemble those at issue in *People v. Centeno*, *supra*, 60 Cal.4th 659. Relevant to our analysis is this part of the prosecutor's argument: "'Is it reasonable to believe that a shy, scared child who can't even name the body parts made up an embarrassing, humiliating sexual abuse, came and testified to this in a room full of strangers *or the defendant abused Jane Doe. That is what is reasonable, that he abused her.* [¶] Is it reasonable to believe that Jane Doe is lying to set-up the defendant for no reason or is the defendant guilty?' . . . 'Is it reasonable to believe that there is an innocent explanation for a grown man [lying] on a seven year old? No, that is not reasonable. Is it reasonable to believe that there is an innocent explanation for the defendant taking his penis out of his pants when he's on top of a seven-year-old child? No, that is not reasonable. Is it reasonable to believe that the defendant is being set-up in what is really a very unsophisticated conspiracy led by an officer who has never met the defendant *or he*['*s*] *good for it? That is what is reasonable. He's good for it.*'" (*Id.* at pp. 671-672.)

"The Supreme Court concluded the italicized parts of the prosecutor's argument misstated the burden of proof because they 'left the jury with the impression that so long as [the prosecutor's] interpretation of the evidence was reasonable, the People had met their burden.' [Citation.] The prosecutor did not simply urge the jury to accept the reasonable and reject the unreasonable in evaluating the evidence. 'Rather, [the prosecutor] confounded the concept of rejecting unreasonable inference[s] with the standard of proof beyond a reasonable doubt. She repeatedly suggested that the jury could find defendant guilty based on a "reasonable" account of the evidence. These

38

remarks clearly diluted the People's burden.'" (*People v. Meneses*, *supra*, 41 Cal.App.5th at p. 73.)

Unlike the argument in *People v. Centeno*, *supra*, 60 Cal.4th 659, here, the prosecutor's argument focused on evaluating the evidence. He did not muddle the concept of rejecting unreasonable inferences with the standard of proof beyond a reasonable doubt. Rather, he argued the reasonable inferences that could be drawn from the trial evidence—noting that "if you have two reasonable interpretations of the evidence, you must accept the one that points to innocence"—and urged the jury to "'"'accept the reasonable and reject the unreasonable'"' in evaluating the evidence before it.'" (*People v. Meneses*, *supra*, 41 Cal.App.5th at p. 71.) There was no prosecutorial error.

Because we conclude there was no prosecutorial error in the prosecutor's closing argument, Chavira's trial counsel was not ineffective for failing to object.

### 3. *Harrison's claim.*

Harrison argues his counsel failed to act as a conscientious advocate during the hearing on the motion for new trial by relying on the arguments of cocounsel instead of arguing that Harrison was in an entirely different position from his codefendants because there was no evidence, absent B.'s testimony, that he actually committed the murder. As we explain in section II.E., *post*, the motion for new trial was properly denied as to all defendants, including Harrison. Thus, Harrison's argument that his trial counsel was ineffective for relying on the argument of cocounsel is without merit.

39

*E. The Trial Court Did Not Abuse Its Discretion in Denying Defendants' Motion*

*for New Trial.*

All three defendants contend the trial court's refusal to grant their motion for new trial under section 1181 based on the newly discovered evidence of B.'s posttestimony attempted fraud constitutes an abuse of discretion. We disagree.

### 1. *General legal principles.*

"A new trial should be granted based on newly discovered evidence only if the evidence is 'material to the defendant' and the defendant 'could not, with reasonable diligence, have discovered and produced [the evidence] at the trial.' [Citation.] The newly discovered evidence must ""'be such as to render a different result probable on a retrial of the cause.'"" [Citation.] 'Critically, "[a] new trial on the ground of newly discovered evidence is not granted where the only value of the newly discovered testimony is as impeaching evidence" or to contradict a witness of the opposing party.' [Citations.] 'On appeal, a trial court's ruling on a motion for new trial is reviewed under a deferential abuse of discretion standard. [Citation.] Its ruling will not be disturbed unless defendant establishes "a 'manifest and unmistakable abuse of discretion.'"'" (*People v. Jimenez* (2019) 32 Cal.App.5th 409, 423.)

### 2. *Additional background information.*

On February 7, 2019, Bennett filed a motion for new trial on the grounds of newly discovered evidence. According to the motion, B. testified on April 20, 2017, and the jury rendered its verdict on May 4, 2017. During B.'s testimony, she repeatedly claimed

that she was no longer involved in criminal activity and was being truthful.[13]  However, during the month following B.'s testimony, she was under investigation for the fraudulent attempt to alter and negotiate a check.  On April 27, 2017, B. used the mileage reimbursement check she had received from the district attorney's office to alter, forge, and deposit several additional checks drawn on the district's attorney's office account.  Bennett's counsel was informed of the investigation "[s]ometime after the verdict but prior to sentencing."  Based on the investigation, Bennett moved for a new trial on the grounds B.'s recent criminal conduct impeached her trial testimony that "she had

---

[13]  Bennett's counsel cross-examined B. as to her honesty as follows:

"Q.  You believe that you're truthful; right?
"A.  Yes.
"Q.  And would you believe that an honest woman is one who tells the truth?
"A.  Yes.
"Q.  Okay.  And you're telling us that you told us the truth here; right?
"A.  Yes.  [¶] . . . [¶]
"Q.  And you're saying you have not lied to us; right?
"A.  No.  [¶] . . . [¶]
"Q.  In regards to honesty and your definition of honesty, do you think an honest woman steals?
"A.  No.
"Q.  But you've stolen before; right?
"A.  In the past.  I've changed.  People change."

Bennett's counsel later pressed B. further:

"Q.  . . .  You swear that now that you're under oath . . . you're being an honest woman; right?
"A.  Yes, absolutely.
"Q.  So when . . . did you switch from being this convicted fraud to now being an honest woman?
"A.  I have a teenage daughter and seven-year-old that I'm not going back to that lifestyle ever again.  That's why.
"Q.  But our past never really escapes us, does it?
"A.  It doesn't, but you can learn from it, and I have."

41

changed and was now different because of maturity, seeing the errors of her ways and her children."

At the hearing on the motion, Bennett's counsel argued B.'s conduct impeached her claim that "she's no longer a fraud." He asserted this new evidence was more likely to result in a conviction of second degree murder or involuntary manslaughter because the only evidence that supported a finding that the murder was a "planned act" came from B. The trial court cited *People v. Delgado* (1993) 5 Cal.4th 312 for the "five factors to consider when ruling on a motion" for new trial, and explained that it was the third factor, whether a different result was probable, that was the "real issue." According to the court, even without B.'s testimony, there was other evidence that defendants committed a first degree murder, specifically, (1) Chavira's uncle's testimony about Chavira's confession; (2) Bennett's family members who testified that Bennett and Chavira talked about killing the victim a week prior to actually doing so; and (3) Bennett's aunt's testimony that Chavira had a bad temper and liked to build weapons and knives. The prosecutor argued the motion for new trial fails for three reasons: (1) you cannot impeach somebody for something they have not done yet (*People v. Hall* (2010) 187 Cal.App.4th 282); (2) newly discovered evidence that merely impeaches a witness is not grounds for granting said motion; and (3) the new evidence would not change the verdict.

In denying the motion for new trial, the trial court noted that B. knew facts about the murder, such as the bag being placed over the victim's head, that she could not have otherwise known, the new evidence only impeaches B.'s testimony, and "a different result at a retrial is not probable in this case."

42

### 3. *Analysis.*

In the context of motions for new trial, courts have held that the reasonable probability standard does not mean "'more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.'" (*People v. Soojian* (2010) 190 Cal.App.4th 491, 519.)

To begin with, defendants contend the trial court applied an incorrect standard because it wrongly understood the term "probable" to mean "'more likely than not.'" We disagree. Initially, the trial court stated, "the real issue . . . is whether . . . it's probable, . . . that it's more likely than not that on a retrial of this case, that there would be a different result." However, later the court asked, "So, um, tell me, Counsel, how you believe it is probable that there would be a different result at a retrial." After commenting on the evidence and citing to *People v. Hall*, *supra*, 187 Cal.App.4th 282, the court concluded "that a different result at a retrial is not probable in this case." The court's fleeting reference to "more likely than not" throughout its extensive discussion of the evidence (including the newly discovered evidence) and the relevant case law fails to establish that the court applied the wrong standard or misunderstood the term probable. (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496 ["The general rule is that a trial court is presumed to have been aware of and followed the applicable law."].) Rather, the record demonstrates the court applied the correct standard when it denied defendants' motion for new trial.

Turning to the merits of the motion for new trial, Chavira and Bennett assert the newly discovered evidence of B.'s latest criminal conduct would have cast doubt on her

testimony as to three main assertions: (1) Bennett placed a plastic bag over the victim's head in order to kill him; (2) the defendants discussed a plan to get rid of the victim so Bennett could be with Harrison; and (3) Bennett left the garage and returned to find Chavira hitting the victim with a stick-like weapon. Harrison contends the new evidence not just impeaches B., but it shows she committed perjury and, without her testimony, there is insufficient evidence to establish that he participated in the homicide. We agree the new evidence calls into question B.'s candor; however, her honesty was the subject of extensive cross-examination by defense counsel. The jury was aware of her numerous acts of identity theft, including her forging access cards, obtaining money by false pretenses, welfare fraud, and federal bank fraud. Jurors were also aware that she had received a deal from the district attorney's office in exchange for her testimony. Nonetheless, the jurors discounted the importance of her white-collar crimes as to her veracity and convicted defendants of first degree murder.

Although B.'s testimony was greatly important to the prosecution's case, it was not the only evidence of defendants' actions. The jury was aware of the autopsy report, the forensics report regarding the presence of the victim's blood in various places (including defendants' vehicles), phone records showing location and call logs, Bennett and Chavira's statements to family members that they were going to kill the victim, eye witness identification of defendants' presence at the victim's home on the night of his murder, Bennett's disposal of the victim's possessions, and Chavira's confession to his uncle. Each defendant's participation in the homicide was established by circumstantial evidence.

44

The fact that B. was able to provide specific details of the homicide—blunt impact injuries to the victim's head, a plastic bag was over the victim's head, and all three defendants cleaned up the garage—which had not been released to the public but were corroborated by multiple sources of independent evidence, and many personal details regarding defendants and their lives, lends credibility to her testimony. But for Bennett sharing the intimate facts of the victim's homicide, B. would not know what happened. Moreover, the jurors' requested readback of B.'s testimony, without her cross-examination, indicates their knowledge of B.'s numerous convictions for identity theft did not dissuade them from convicting defendants of first degree murder. It is unlikely the jurors would have changed their determination of each defendant's guilt, even if they had received another piece of evidence that questioned B.'s credibility. (*People v. Hall*, *supra*, 187 Cal.App.4th at p. 299 ["'[A] new trial on the ground of newly discovered evidence is not granted where the only value of the newly discovered testimony is as impeaching evidence' or to contradict a witness of the opposing party."]; see *People v. Shoals* (1992) 8 Cal.App.4th 475, 488 [new trial properly denied where new evidence did not contradict the strongest evidence introduced against the defendant and at best created a conflict with the prosecution's prima facie case].) Therefore, the trial court did not abuse its discretion when it denied the motion for a new trial.

       *F.    Cumulative Effect of Any Errors.*

Chavira contends the cumulative effect of the errors at trial warrants reversal of the judgment. As we have rejected on the merits defendants' claims of error, we reject

45

Chavira's contention as to the cumulative effect of any alleged errors. (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236.)

G.     *Senate Bill No. 136 (2019-2020 Reg. Sess.).*

The parties agree Harrison's five one-year prior prison term enhancements must be stricken in light of Senate Bill No. 136.

The information filed against Harrison alleged that he had served five prior prison terms for vehicle theft (Veh. Code, § 10851), robbery (Pen. Code, § 211), attempted robbery (Pen. Code, §§ 664, 211), and two instances of being a felon in the possession of a firearm (Pen. Code, § 12021). (Pen. Code, former §§ 667.5, subd. (b).) Harrison admitted each of these alleged priors, and the trial court found them to be true. The trial court imposed sentence on the prior prison term enhancements but ordered the punishment stricken.

"Senate Bill No. 136 amended section 667.5, subdivision (b) [(Stats. 2019, ch. 590, § 1, eff. Jan. 1, 2020)] regarding prior prison term enhancements. Former section 667.5, subdivision (b) imposed an additional one-year term for each prior separate prison term or county jail felony term, except under specified circumstances. However, amended Penal Code section 667.5, subdivision (b) imposes that additional one-year term only for each prior separate prison term served for a conviction of a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). [Citation.] 'By eliminating section 667.5, subdivision (b) enhancements for all prior prison terms except those for sexually violent offenses, the Legislature clearly expressed its intent in Senate Bill No. 136 . . . to reduce or mitigate the punishment for prior prison

46

terms for offenses other than sexually violent offenses.'" (*People v. Smith* (2020) 46 Cal.App.5th 375, 396.)  Accordingly, the now-inapplicable five one-year prior prison term enhancements under former section 667.5, subdivision (b), currently attached to Harrison's sentence are stricken.  (§ 1260 [granting appellate court power to reduce punishment imposed].)

       H.     *Harrison's Abstract of Judgment Should Be Corrected.*

The parties agree the abstract of judgment must be corrected because it erroneously includes the $10,000 parole revocation restitution fine (Pen. Code, § 1202.45), $80 court operations assessment (Pen. Code, § 1465.8), $60 conviction assessment (Gov. Code, § 70373), and $514.58 booking fees (Gov. Code, § 29550), which the trial court "suspended until such time as it is determined that Mr. Harrison has the financial ability to pay."  However, the abstract of judgment does not reflect that these fines, fees, and assessments were suspended.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186 [Where there is a discrepancy between the oral pronouncement of judgment and the minute order or abstract of judgment, the oral pronouncement controls.].)  We may order correction of the abstract of judgment when it does not accurately reflect the oral judgment of the trial court.  (*Id.* at p. 185.)  Therefore, the abstract of judgment should be corrected to reflect that the trial court ordered the parole revocation restitution fine, court operations assessment, criminal conviction assessment, and booking fees to be suspended until it is determined that Harrison has the ability to pay them.

## III.  DISPOSITION

As to defendant Harrison, we strike the five one-year prior prison term enhancements imposed under former section 667.5, subdivision (b), pursuant to Senate Bill No. 136, and order the abstract of judgment be corrected to reflect that the $10,000 parole revocation restitution fine, $80 court operations assessment, $60 conviction assessment, and $514.58 booking fees are suspended until such time as it is determined that Harrison has the financial ability to pay.  The clerk of the superior court is directed to prepare an amended abstract of judgment for Harrison and forward a copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

As to defendants Bennett and Chavira, the judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>McKINSTER</u>
                                                                                        J.

We concur:

<u>RAMIREZ</u>
                    P. J.

<u>FIELDS</u>
                    J.